# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche Manning | Sitting Judge if Other than Assigned Judge | Nan R. Nolan |
|---|---|---|---|
| CASE NUMBER | 02 C 7315 | DATE | 11/10/2004 |
| CASE TITLE | Western United Life Assurance Co. vs. Fifth Third Bank, et al. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, plaintiff's motion for a protective order is denied. Plaintiff is ordered to produce the documents at issue to defendant 5th 3rd Bank.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | NOV 12 2004 date docketed | 80 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | CLERK | 11/10/2004 | |
| | | 2004 NOV 10 PM 4:05 | date mailed notice | |
| hmb | courtroom deputy's initials | | hmb | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| WESTERN UNITED LIFE ASSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | No. 02 C 7315 |
| FIFTH THIRD BANK; SERFIN TRUST, LLC; and SCOTT SERFLING, | ) ) ) | Nan R. Nolan, Magistrate Judge |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Western United Life Assurance Company ("Western") moves this court for a protective order precluding defendant Fifth Third Bank ("Fifth Third") from obtaining and/or using certain documents disclosed to the United States Attorney's Office which Western claims are protected by the work product doctrine.[1]

---

[1] While Western originally argued that the documents at issue were protected by both the attorney-client privilege and the work product doctrine (*Western's Motion for Protective Order*, at 1, 2, 5-6; Ex. 1; *Supplement to Western's Motion for Protective Order*, at 2 n.2). This was apparently done in error as, in its reply memorandum, Western indicates that it is only arguing that the documents at issue were protected by the work product doctrine and that Western has not waived that protection. (*Western's Reply in Support of Its Motion*, at 1 n.1). As such, it does not respond to Fifth Third's arguments that the documents at issue were not authored by "control groups personnel" and therefore, cannot be protected by the attorney-client privilege. *See Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill.2d 103, 59 Ill.Dec. 666, 670-75, 432 N.E.2d 250, 254-59 (1982); *Favala v. Cumberland Eng'g Co.*, 17 F.3d 987, 989 (7th Cir.1994). Accordingly, the court finds that Western has waived or abandoned any claims it might have that the documents at issue are protected by the attorney-client privilege.



# I. BACKGROUND

This litigation stems from a failed plan to develop a Ford dealership in Gurnee, Illinois.[2] According to Western's allegations, Fifth Third was the original source of financing on the project in 2000, and loaned Scott Serfling – a co-defendant – and others over $10 million. Serfling allegedly diverted the proceeds of that loan, however, and Ford disavowed any interest in the project. Fifth Third learned of this trouble in the summer of 2001 and, in order to avoid losing a substantial portion of the value of the loan, Fifth Third purportedly devised an exit strategy involving Western. According to Western, in early 2002, Fifth Third and Serfling induced it to lend the Serfin Trust – another co-defendant – nearly $12 million, on the strength of a lease agreement from Ford – apparently bogus – which propped up a $15 million appraisal of the property. Western filed suit in October of 2002, charging both Fifth Third and Serfling with various fraudulent misrepresentations in connection with the loan. Serfling is currently the target of federal criminal prosecution in *United States v. Capri*, No. 03-CR-300 (N.D.Ill.).

According to Western, prior to filing suit, its attorneys requested certain Western employees involved in the ill-advised transaction to draw up documents describing the events culminating in the loan. (*Western's Motion for Protective Order*, at 2). Those

---

[2] The court draws its narrative of the background of this motion from the allegations in Western's *Third Amended Complaint*. The court accepts these allegations only for the limited purposes of ruling on this motion, and does so advisedly insofar as Western's three previous complaints have been dismissed, in whole or in part, due to various defects.

2

documents are at issue here. One is dated July 22-24, 2002, and authored by Dan Geittman and Sheila Parpolia, and one is dated July 26, 2002, and authored by John Byers. Byers was the initial Western employee contacted regarding the transaction, Geittman was involved in underwriting the loan, and Parpolia was a closer for the loan. (*Western's Motion for Protective Order*, at 2). Western's privileged log indicates that these memoranda reference non-privileged documents that have already been produced in discovery, and they are protected from disclosure by the work product doctrine. (*Western's Motion for Protective Order*, Ex. 1).

The status of these documents recently became an issue when Fifth Third came into possession of the Parpolia-authored portion ("Parpolia memo") of the July 22-24 memo. The Parpolia memo was attached to a pleading Serfling filed in the government's criminal proceeding against him, and Fifth Third discovered it on June 30, 2004, as a result of monitoring the Serfling criminal case. (*Fifth Third's Response to Western's Motion for Protective Order*, at 5; Ex. G). Serfling had obtained the memo from the United States Attorney's office during the course of discovery. (*Fifth Third's Response to Western's Motion for Protective Order*, Ex. G, at 4). When Fifth Third informed Western of this, Western indicated the memo was privileged, but had no idea how the United States Attorney might have obtained it. (*Western's Motion for Protective Order*, at 3). In response to Western's inquiries, the United States Attorney's office informed Western that the document had been produced pursuant to a subpoena served on Western, dated June

25, 2002. (*Western's Motion for Protective Order*, at 3; *Supplement to Western's Motion for Protective Order*; Ex. 1). The subpoena targeted documents pertaining to Scott Serfling and Serfin Trust, and requested production by July 18, 2002. (*Supplement to Western's Motion for Protective Order*; Ex. 1). Western was unable to find any record of the subpoena at the time it filed the instant motion (*Western's Motion for Protective Order*, at 3), but eventually discovered it along with records of document productions on June 26, June 28, and July 12, 2002. (*Supplement to Western's Motion for Protective Order*; Ex. 1). Western also found correspondence that indicated that Parpolia transmitted the documents at issue here to F.B.I. agent Jim Reilly on August 7, 2002. (*Supplement to Western's Motion for Protective Order*, at 2; Ex. 2).

The parties agree that the documents at issue were not provided to the government pursuant to the subpoena, or disclosed inadvertently, but were produced voluntarily. (*Fifth Third's Response to Western's Motion for Protective Order*, at 2-3; *Western's Reply in Support of Its Motion for Protective Order*, at 2 n.3, 3). Western argues that is voluntary cooperation with the government, as part of a criminal investigation of an individual that had victimized Western, should not result in the waiver of its work product protection. Fifth Third questions whether the documents at issue qualify as work product, but also argues that Western's production of those documents, especially given the manner and circumstances in which they were produced, constitutes a waiver of the work product protection.

4

## II. ANALYSIS

The work product doctrine, initially set out in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385 (1947), is codified as Rule 26(b)(3) of the Federal Rules of Civil Procedure:

> a party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for another party or by or for another party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Fed.R.Civ.P. 26(b)(3). Thus, if a party demonstrates that the materials at issue were prepared in anticipation of litigation, the materials are considered work product and become subject to a qualified privilege from discovery. *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976 (7th Cir. 1996). The Seventh Circuit has cautioned that "[t]he mere fact that litigation does eventually ensue does not, by itself, cloak materials ... with the work product privilege; the privilege is not that broad." *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir.1983). Rather, the court must consider the context and determine whether "the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* at 1119. In so doing, it is important to distinguish between "an investigative report developed in the ordinary course of business" as a precaution for the "remote prospect of litigation" and materials prepared

because "some articulable claim, likely to lead to litigation ... ha[s] arisen." *Logan*, 96 F.3d at 976 (*quoting Binks*, 709 F.2d at 1120).

Here, Western's attorneys requested the production of the documents at issue. At that time, Western had not only learned that Serfling defaulted on the $12 million loan, but that he had secured the loan through a package of misrepresentations, and the apparent forgery of a Ford leasing agreement. It threatened Serfling with litigation in a letter dated June 13, 2002. (*Fifth Third's Response to Western's Motion for Protective Order*: Ex. E). The documents at issue were created in the wake of these revelations, in late July of 2002. Certainly, given the circumstances, Western had an "articulable claim, likely to lead to litigation." The documents at issue, then, qualify as work product created in anticipation of litigation.

The more engaging issue in this dispute is whether Western waived work product protection by voluntarily giving the documents at issue to the United States Attorney. Work product protection is waived when the protected communications are disclosed "in a manner which 'substantially increases the opportunity for potential adversaries to obtain the information.'" *Vardon Golf Co., Inc. v. Karsten Mfg. Corp.*, 213 F.R.D. 528, 534 (N.D.Ill. 2003) (*quoting Blanchard v. EdgeMark Financial Corp.*, 192 F.R.D. 233, 237 (N.D.Ill. 2000). The question is whether the particular disclosure was of such a nature as to enable an adversary to gain access to the information. *Blanchard*, 192 F.R.D. at 237. In determining whether a waiver has occurred, courts consider whether the

disclosure to a third party was "inconsistent with the maintenance of secrecy from the disclosing party's adversary." *Minnesota School Boards Ass'n Ins. Trust v. Employers Ins. Co. of Wausau*, 183 F.R.D. 627, 631 (N.D.Ill. 1999). The circumstances surrounding the disclosure in this case suggest that secrecy was not one of Western's concerns, and that its production of the documents at issue substantially increased Serfling's opportunity to obtain them.

By June 13, 2002, Western had already learned that Serfling had secured his loan based on misrepresentations, and had notified him he was in default and threatened legal action. (*Fifth Third's Response to Western's Motion for Protective Order*; Ex. E). On June 25, 2002, Western was informed by subpoena that Serfling was the target of a criminal investigation. After producing documents pursuant to the subpoena, Western volunteered the three documents at issue here on August 7, 2002. In considering whether a disclosure of documents constituted a waiver, it is appropriate to examine the steps Western might have taken to maintain the documents' confidentiality. *Blanchard*, 192 F.R.D. at 237. There is nothing in the record to suggest that Western asserted the work product protection in connection with either its production of documents pursuant to the subpoena or the subsequent voluntary production of the documents at issue here. Western does not even claim that it did so, nor does it claim that it sought any type of confidentiality agreement from the government, or even any assurances that the purported work product would not be disclosed to Serfling. Such matters were simply not a topic of

7

discussion, and apparently not a concern. Instead, Western produced the documents at issue, without taking any steps to safeguard their contents, apparently without considering that the government was embarking on a prosecution of Serfling that would likely result in the government's eventual production of those documents to Serfling through discovery. That likely result occurred, in the case of all three documents. Western obviously gave no thought to whether the production of those documents substantially increased the opportunity for Serfling to obtain them.

The manner in which Western treated the documents and their production was far too cavalier to suggest that it was concerned about maintaining their secrecy. Western was unaware it had received a subpoena, let alone that it had produced the documents at issue, until nearly two years after it provided them to the government. It only learned these facts because Fifth Third bank came across one of the documents as it monitored the Serfling criminal proceedings – proceedings which, one might imagine, should have also garnered the interest of Western. Even then, Western was unable to confirm it had produced the documents in the month that ensued before it filed its motion for a protective order. It was not until the passing of yet another month that Western finally got a handle on its record-keeping and was able to inform the court, in a supplement to its motion for a protective order, as to the manner in which it had released the documents two years ago; documents it now so jealously claims are secret. Such claims ring hollow given the steps it took, or more accurately, failed to take, to keep them secret.

Western points to no facts surrounding its production of the documents to counter the impression that it was disinterested in them. Instead, it submits that it should not be punished for its cooperation with the government. (*Western's Reply in Support of Its Motion for Protective Order*, at 6). The court's finding of a waiver as to these documents is not a "punishment," but merely an inevitable conclusion drawn from the assessment of the circumstances surrounding their disclosure. Those circumstance fail to indicate that Western treated the documents as confidential work product, or even paused to consider whether they were. Western's attitude – whether it was inattentive or unconcerned – led, foreseeably, to the documents coming into the possession of one of the defendants in this case. It is not punishment to refuse Western's request to put the genie back in the bottle and treat these documents in a manner Western could not be bothered to treat them when it counted. Furthermore, to do so would bring about the undesirable result of one defendant in this case having the materials and the other not having them.

In support of its position, Western relies almost entirely on a single unreported case from the District of New Jersey: *Shulton, Inc. v. Optel Corp.*, 1987 WL 19491 (D.N.J. Nov. 4, 1987). (*Western's Motion for Protective Order*, at 4-5; *Supplement to Western's Motion for Protective Order,* at 2-3; *Western's Reply in Support of its Motion for Protective Order*, at 4-5). Review of that decision, however, does not dissuade the court from its conclusion. In *Shulton*, the plaintiff conducted an in-house investigation of a customer who had defaulted on a $300,000 letter of credit payment. The investigation

uncovered evidence that the customer had been involved in a scheme whereby the plaintiff's products intended for sale abroad were diverted for domestic sale. The plaintiff filed suit, and also turned over its investigative files to the United States Attorney. That office had already convened a grand jury investigation into the scheme, although it is unclear whether the plaintiff was aware of it and no indictment was ever brought. 1991 WL 15203, *1. The defendants in the civil suit learned of the plaintiff's disclosure of the files to the government, and moved to compel their production, arguing that the plaintiff had waived work product protection. Considering the question, the court indicated that:

> disclosure of the privileged information by the party asserting the attorney work product privilege to a third-party does not constitute waiver unless such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary. Whether disclosure is inconsistent with the maintenance of secrecy depends on whether the disclosure substantially increases the possibility that an opposing party could obtain the information disclosed.

1991 WL 15203, *4 (citations omitted). Focusing on whether the disclosure substantially increased the possibility that the defendants could obtain the information, the court stated that the government had only three uses for the information the plaintiff disclosed:

> It could have chosen not to seek an indictment at all. It could have presented the information to a grand jury and obtained no true bill. It could have presented the information to a grand jury, obtained an indictment, and gone to trial. Only the last of the three posed a minor risk that some of the information would be disclosed to defendants.

\*　　\*　　\*

> Only if the case proceeded to trial could any disclosure possibly be obligatory, and even if this were to occur, defendants' access to Shulton's documents would be strictly limited. Defendants would have access only to information discoverable under F.R.Crim.P. 16, under the Jencks Act, 28 U.S.C. § 3500(b), and under *Brady v. Maryland*, 373 U.S. 83 (1963). Defendants have not argued that the entire file would come into their hands through any of these discovery options. Moreover, it is uncertain, although likely, that the criminal matter would proceed to trial before this civil action.

1991 WL 15203, *4-5. As a result, the court found that "the chances that [the plaintiff's] sharing of its investigative file with the government would lead to defendants' discovery of the file's content were exceedingly remote." 1991 WL 15203, *5. It concluded that there was no waiver of work product protection.

With respect to the *Shulton* court, this court finds the formulaic assessment of probabilities that informed its holding less than helpful for two reasons. First, accepting the premise that the government here, like the government in *Shulton*, would have three uses for the disclosed documents does not necessarily mean that eventual disclosure of the documents to Serfling was "exceedingly remote." It is unclear how the *Shulton* court weighed these probabilities – perhaps it felt there was a 33% chance that the criminal case would go to trial – but that court's speculation as to eventual use of the documents at issue before it has no bearing on the probabilities at work here. The court is not prepared to accept as a fact that when Western disclosed the documents at issue here it did not "substantially increase the possibility that an opposing party could obtain the information disclosed." Even under the *Shulton* analysis, the possibility went from none at all to

11

perhaps one in three. That is arguably a substantial increase, and Western does not contend otherwise. Perhaps because, unlike the defendants in *Shulton*, Serfling did, indeed, obtain the documents at issue here.

Second, this court is concerned with the circumstances under which Western disclosed the documents at issue. While the *Shulton* court indicated that disclosure would constitute a waiver where those circumstances were inconsistent with the maintenance of secrecy from the disclosing party's adversary, it did not engage in an analysis of the circumstances of disclosure in that case.[3] Here, however, the court is comfortable finding that the manner in which Western made its disclosure is inconsistent with a desire to maintain the secrecy of the documents at issue. Western certainly engaged in no weighing of the possibility the documents would be obtained by Serfling. In fact, Western was first unaware - for a two-year period - that it had disclosed the documents at all. Then, it was unaware there had been a subpoena. Finally, it was unaware one of the documents had

---

[3] The *Shulton* court's analysis calls into question its value to our deliberations here. In *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1421 (3rd Cir. 1991), the Third Circuit overturned a lower court's ruling that had followed *Shulton* to find no waiver of work product protection because "[d]isclosing information to any ally may strengthen, rather than destroy, the adversary process, as allies who fortify their cases against their mutual adversary have a greater chance of defeating that adversary." 951 F.2d at 391. In so doing, the appellate court focused on whether the circumstances surrounding the disclosure evidenced conscious disregard of the possibility that an adversary might obtain the protected materials. 951 F.2d at 1431. The circumstances here, certainly, evidenced just such a disregard on Western's part.

been made public. Those are simply not circumstance consistent with the maintenance of the secrecy of those documents.

Western also cites *Trans Pacific Ins. Co. v. Transpacific Inc. Co.*, 1991 WL 15203 (E.D.Pa. July 31, 1991) for the proposition that "the law encourages litigants with 'common interests' to share the fruits of their trial preparation efforts." (*Western's Motion for Protective Order*, at 5; *Supplement to Western's Motion for Protective Order,* at 3; *Western's Reply in Support of its Motion for Protective Order*, at 5). In so doing, it is unclear whether Western is arguing, albeit offhandedly, that there was no waiver in this case due to its "common interests" with the government. If so, it has failed to establish such a theory is applicable. The common interest rule covers communications between parties with a common interest, but only if (1) one party is seeking confidential information from the other on behalf of an attorney; (2) one party is relaying confidential information to the other on behalf of an attorney; and (3) the parties are communicating work-product that is related to the litigation. *Beneficial Franchise Co., Inc. v. Bank One, N.A.*, 205 F.R.D. 212, 220 (N.D. Ill. 2001). Western has not argued as to the existence of any of these elements, and the record as it stands indicates that Parpolia was not acting on behalf of an attorney when she produced the documents at issue. In addition, it is questionable whether the F.B.I. agent to whom she volunteered the documents was seeking them on behalf of an attorney. Moreover, the existence of common interests between transferor and transferee is just one consideration relevant to deciding whether the disclosure is

consistent with the nature of the work product privilege. *U.S. v. American Tel. and Tel. Co.*, 642 F.2d 1285, 1299 (D.C.Cir. 1980). Here, as already discussed, the circumstances surrounding the disclosure weigh heavily against a finding that Western was interested in maintaining the documents' confidentiality or was concerned with the possibility that Serfling might obtained them. Indeed, when the factors underlying the common interest rule are examined, it becomes all the more clear that it is inapplicable in this case:

> with common interests on a particular issue against a common adversary, the transferee is not at all likely to disclose the work product material to the adversary. When the transfer to a party with such common interests is conducted under a guarantee of confidentiality, the case against waiver is even stronger.

*Id.* at 1299-1300. Given the manner in which Western disclosed the documents at issue, without any attempt to secure their secrecy or determine the likelihood that they would later be available through discovery, the factors underlying the common interest rule are not at work here.

## III. CONCLUSION

For the foregoing reasons, the plaintiff's motion for a protective order is denied, and plaintiff is ordered to produce the documents at issue to defendant Fifth Third Bank.

ENTERED: *Nan R. Nolan*
NAN R. NOLAN
U.S. MAGISTRATE JUDGE

DATE: 11-10-04